UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIMEEN CARTER, | 14 Civ. 4236 (VEC) |
| Plaintiff, | ECF CASE |
| -against- | **SECOND AMENDED COMPLAINT** |
| CITY OF NEW YORK; NEW YORK CITY HEALTH & HOSPITALS CORPORATION; DWAIN RODRIGUES; Correction Officer ALFONSO BISONO; Correction Officer GERARD ARCHER; BOYCE CARTER; and ALEXIS SANCHEZ , | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Elimeen Carter (hereinafter "Mr. Carter"), by his attorneys Manatt, Phelps & Phillips, LLP, for his Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action under 42 U.S.C. § 1983 and applicable state law filed by Elimeen Carter, an inmate who was savagely beaten on two occasions while housed at the Bellevue Hospital Prison Ward, a facility jointly controlled by New York City's Department of Correction and Health and Hospitals Corporation.  The first attack took place when Mr. Carter emerged from his patient room on the morning of February 11 to take a shower in the nearby shower room.   Wearing only a towel and presenting no threat, Mr. Carter was met almost immediately with a dangerous chokehold from a Health and Hospitals Corporation employee, Duane Rodrigues, who clamped his arm around Mr. Carter's neck to cut off circulation and wrestled Mr. Carter to the ground.  The attack on Mr. Carter occurred in full view of at least one correction officer, but he did nothing to stop it.

2.      Defendants City and HHC permitted Rodrigues to finish the job the following

morning, assigning him to monitor and supervise Mr. Carter.  With other DOC and HHC employees watching (and at times, in the case of two HHC employees, assisting), Rodrigues unleashed an assault that left Mr. Carter with a blowout fracture of the cavity surrounding his left eye, multiple additional facial fractures and severe mental and emotional distress.  Rodrigues began his attack by charging at Mr. Carter – who was attempting to retreat with his hands raised in a gesture of surrender – and kicking Mr. Carter in the groin.  While Mr. Carter lay helpless on the ground, Rodrigues then punched and elbowed Mr. Carter in the face against a hard floor and then, with full body weight, dropped his knee onto Mr. Carter's body.  As the attack escalated, two HHC employees chose to intervene on *Rodrigues's* behalf, restraining Mr. Carter so he could not escape the onslaught.  None of the numerous Health and Hospitals Corporation and Department of Correction employees present at the scene did anything to help as Mr. Carter's assailant grabbed him by the hair, pulled him into a room, and continued the assault.

3.     Mr. Carter seeks redress against the parties responsible for his injuries:  the City of New York; the New York City Health and Hospitals Corporation; Dwain Rodrigues; Correction Officers Alfonso Bisono and Gerard Archer; and HHC employees Boyce Carter and Alexis Sanchez.

## JURISDICTION AND VENUE

4.     This action arises under the Eighth and Fourteenth Amendments of the United States Constitution, under 42 U.S.C. §§ 1983 and 1988, and the New York state constitution and common law.

5.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

6.     The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

7.      Plaintiff demands trial by jury in this action.

## PARTIES

8.      Elimeen Carter is a citizen of the United States and a resident of New York.  At the time of the events giving rise to this suit, Mr. Carter was in custody at the Bellevue Hospital Prison Ward facility located at 462 First Avenue, New York, New York.  All of the events giving rise to the Complaint occurred in New York, New York.

9.      Defendant City of New York ("City") is a municipal corporation organized and existing under the laws of the State of New York, which operates a number of detention jails, primarily through its Department of Correction ("DOC" or "Department").  The City operates a prison ward inside of Bellevue Hospital for inmates requiring medical and psychiatric care, which is jointly administered by the DOC and the New York City Health and Hospitals Corporation.  DOC, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting and investigation of force by staff, and access to medical and other program services mandated by local law and court orders.  The Department is responsible for the appointment, training, supervision and conduct of DOC personnel, including the DOC defendants herein.

10.     Defendant New York City Health and Hospitals Corporation ("HHC") is a municipal public benefit corporation which, along with DOC, operates the Bellevue Hospital Prison Ward facility.  HHC, through its senior officials and its officials at Bellevue Hospital Prison Ward, promulgates and implements policies, including with respect to the use, reporting and investigation of force by its staff, and access to medical and other program services mandated by local law and court orders.  HHC is responsible for the appointment, training, supervision and conduct of HHC personnel, including the HHC defendants herein.

11.     On information and belief, Defendant Dwain Rodrigues ("Rodrigues") is a Psychiatric Social Health Technician ("PSH Technician") at the Bellevue Hospital Prison Ward. On information and belief, at the time of the attack Mr. Rodrigues was employed by HHC, and acted within the scope of his employment as such.

12.     On information and belief, Defendant Alfonso Bisono ("Officer Bisono") is a correction officer who, at the time of the attack on Mr. Carter, was employed by the City at the Bellevue Hospital Prison Ward, and acted within the scope of his employment as such.

13.     On information and belief, Defendant Gerard Archer ("Officer Archer") is a correction officer who, at the time of the attack on Mr. Carter, was employed by the City at the Bellevue Hospital Prison Ward, and acted within the scope of his employment as such.

14.     On information and belief, Defendant Alexis Sanchez ("Sanchez") is a PSH Technician at the Bellevue Hospital Prison Ward who, at the time of the attack on Mr. Carter, was employed by HHC, and acted within the scope of his employment as such.

15.      On information and belief, Defendant Boyce Carter ("Boyce Carter") is a PSH Technician at the Bellevue Hospital Prison Ward who, at the time of the attack on Mr. Carter, was employed by HHC, and acted within the scope of his employment as such.  Defendants Rodrigues, Officer Bisono, Officer Archer, Sanchez and Boyce Carter are referred to herein as the "Individual Defendants."

## FACTUAL ALLEGATIONS

**The Events Preceding the Assault on Elimeen Carter**

16.     On or about February 4, 2014, Elimeen Carter was relocated from the detention facility at Rikers Island, where he was awaiting trial, to Bellevue Hospital Prison Ward, in order to receive treatment for mental illness.   Defendant Rodrigues was one of the PSH Technicians responsible for Mr. Carter's care at Bellevue.

17.     On information and belief, defendant Rodrigues was and is actively involved in the sport of underground amateur boxing and fighting, and has undergone training in inflicting maximum injury with his fists and legs.  On information and belief, Defendants were aware of Rodrigues's interests in violence, but took no measures to limit Rodrigues's access to Mr. Carter or the other patients in their care and custody.

18.     About one week into Mr. Carter's stay at Bellevue, he would be involved in two separate physical confrontations with Rodrigues.  Despite the first incident, Defendants took no steps to limit Rodrigues's access to Carter, a decision that directly resulted, one day later, in Rodrigues again attacking Carter and causing serious and traumatic injuries.

19.     The first encounter occurred on February 11, 2014.  On that day, Mr. Carter emerged from his room wearing only a towel, in the hope of going to the shower room to take a shower, as patients at Bellevue Prison Ward are permitted to do.  Instead of allowing Mr. Carter to pass, Rodrigues, wrapped his arm around Mr. Carter's neck and used a powerful chokehold to prevent blood from circulating to Mr. Carter's brain.  Rodrigues forced Mr. Carter to the ground.

20.     This unjustified chokehold took place in the full view of Defendant Bisono, who chose not to intervene, and, on information and belief, failed to report the fact that Rodrigues attacked an inmate to his supervisors.  Defendants City and HHC, on information and belief, were nevertheless aware (or should have been aware) of Rodrigues' February 11  attack on Mr. Carter, but did not limit Rodrigues's access to Mr. Carter in any way.

21.     On information and belief, defendants City and HHC have a policy and/or practice that even after a physical encounter with an inmate, HHC employees are freely allowed to supervise such inmates on a one-on-one basis, despite the obvious risk to an inmate's health and safety.

22.     Moreover, as discussed more fully below, defendants City and HHC have a policy and/or practice that instructs employees not to report instances of abuse by other staff members, and to instead place the blame for uses of force at the feet of victimized inmates.  This policy inevitably results in repeat violence by abusive staff members against inmates – precisely what happened to Elimeen Carter.

**Rodrigues Repeatedly Assaults Mr. Carter and HHC and DOC Staff Fail to Restrain Him**

23.     On the morning of the day of the assault, February 12, 2014, defendant Rodrigues was assigned to supervise Mr. Carter on a one-on-one basis.  As discussed below, this assignment had disastrous consequences for Mr. Carter.

24.     On or about 7:45 AM, defendant Rodrigues began engaging in a verbal argument with Mr. Carter in the hallway in front of Mr. Carter's room.

25.     As Mr. Carter retreated slowly away from defendant Rodrigues in an attempt to end the argument, Rodrigues lunged at Mr. Carter, kicking him in the groin area with heavy work boots, knocking Mr. Carter to the floor.

26.     This attack was unprovoked and unjustified, and Rodrigues quickly escalated his assault into an unrestrained beating of Mr. Carter.

27.     Defendant Rodrigues punched and elbowed Mr. Carter in the face and slammed Mr. Carter's head against the prison ward hallway's hard floor.

28.     With Mr. Carter incapacitated as a result of these blows, defendant Rodrigues stood up and dropped his knee directly onto Mr. Carter.

29.     Part of Defendant Rodrigues's beating of Mr. Carter was witnessed by other HHC employees, including Defendants Sanchez and Boyce Carter, both PSH Technicians.  Defendants Sanchez and Boyce Carter facilitated the attack by restraining an already helpless Mr. Carter.

Defendants Sanchez and Boyce Carter failed to intervene to stop defendant Rodrigues's violent attack on Mr. Carter, as did Defendant Archer, who stood by through the entire attack and did nothing.

30.     With Defendants Sanchez and Boyce Carter still restraining Mr. Carter, Rodrigues Rodrigues grabbed Mr. Carter by his hair and dragged him into a nearby room.

31.     Mr. Carter, bloodied, was left on the floor in the room with Rodrigues.  There, Rodrigues continued his attack on Mr. Carter.

32.     By that time, numerous staffers, including Defendants Sanchez, Boyce Carter and Archer, were congregated inside or immediately outside of the room in which Mr. Carter was being beaten, but none took any action to stop the beating or remove defendant Rodrigues.

33.     Defendant Rodrigues eventually left the room on his own accord and paced the hallway in a menacing manner.

34.     The entire attack on Mr. Carter was recorded by at least two cameras in the Bellevue Hospital Prison Ward facility, and this recording remains in the possession of defendants City and HHC.

35.     Mr. Carter did not assault or attempt to assault any officer or staff member, nor did he present a threat to the personal safety of any staffer at the Bellevue Hospital Prison Ward so as to require the use of force.

36.     Rodrigues acted sadistically and maliciously and demonstrated deliberate indifference toward Mr. Carter's rights and his physical well-being.

37.     Defendants Sanchez and Boyce Carter, and Officer Archer demonstrated deliberate indifference toward Mr. Carter's rights and his physical well-being by refusing to intervene to stop defendant Rodrigues's beating of Mr. Carter, and at times assisting Rodrigues

in that beating.

**Defendants Cover Up the Assault, Leading to a Deprivation of Necessary Medical Care**

38.     After defendant Rodrigues's attack on Mr. Carter had concluded, Mr. Carter was transported to the medical treatment section of Bellevue Hospital, where he was diagnosed with a blowout orbital fracture of the orbital cavity surrounding his left eye socket and multiple nasal fractures.

39.     On information and belief, immediately following the assault, some or all of the Individual Defendants falsely communicated internally and to their supervisors that Mr. Carter attacked defendant Rodrigues, when the reverse was true.

40.     On information and belief, medical staff treating Mr. Carter after the assault were also falsely informed by the defendants that Mr. Carter had attacked defendant Rodrigues, and not vice versa.

41.     On information and belief, these defendants knew this accusation to be false as a result of, *inter alia*, observing the attack, observing that Mr. Carter did not strike back at Rodrigues, observing defendant Rodrigues's behavior following the attack, and seeing that Mr. Carter was bloodied and badly bruised, while defendant Rodrigues was not injured.

42.     As a direct and foreseeable consequence of those false statements, Mr. Carter was unnecessarily administered a sedative and was deprived of psychiatric care to treat the trauma arising out of the assault.

43.     Indeed, Mr. Carter's emotional trauma was exacerbated by the medical staff who, relying on false reports from defendants, treated Mr. Carter as an aggressor, and not a victim of unprovoked violence.

44.     A day later, on February 13, 2014, while Mr. Carter attempted to recover from the

brutal attack on him, Defendant DOC presented with a "Report and Notice of Infraction" falsely charging him with assaulting Rodrigues, and threatening him with disciplinary action based on the Individual Defendants' lies.

45.     The cover-up orchestrated by the Individual Defendants is consistent with City's and HHC's practice of permitting, and at times encouraging, their employees to hide incidents of abuse against inmates, and to instead blame all uses of force on inmates regardless of the culpability of DOC and HHC employees.  As but one example of this policy and practice, the "Incident Report Form" used by DOC for reporting of all uses of force instructs DOC employees to describe any such incident in terms that justify the use of force:

> IF FORCE WAS USED:  Include in the section below the specific events and actions *by the inmate(s) which led to or caused the incident*, *the actions which made the use of force necessary in the circumstances*, and the type and extent of force used.

Thus, even on the principal forms used to preserve information about an incident, the City directs its employees to always place blame for any use of force at the feet of inmates, to assume that all violence visited on inmates was "necessary in the circumstances," and to come up with "specific events and actions" supporting that conclusion.

46.     This policy and practice – which any reasonable person would know to be illegal and to potentially violate the constitutional rights of inmates – was implemented by Officer Bisono when he failed to report that Rodrigues had attacked an inmate using a dangerous and prohibited chokehold.  It was further implemented by the other Individual Defendants when they lied about the September 12 attack on Mr. Carter and falsely portrayed Mr. Carter as the aggressor.

47.     As a result of the assault and its aftermath, including the cover-up orchestrated by Defendants, Mr. Carter suffered, and continues to suffer from severe emotional and physical

injuries, including multiple facial fractures, abdominal pain and bruising, and emotional trauma.

**The City's Institutionalized Abuse of the Mentally Ill**

48.     The assault on Mr. Carter was a result of the City's, DOC's and HHC's pattern
and practice of deliberate indifference toward the safety of mentally ill inmates.  Indeed, abuse
and violence against mentally ill inmates is endemic in city jails, facilitated by a culture in which
correction officers do little to stop abuses being committed by their peers.

49.     Officials exercising supervisory care over mentally ill inmates in city jails,
whether as employees of DOC or HHC, receive inadequate training in the supervision of
mentally ill inmates.

50.     Indeed, defendants City and HHC have permitted a pattern and practice of staff
failing to intervene to protect mentally ill inmates against abuse by staff members.

51.     On May 17, 2007, for example, as alleged in a federal civil complaint, a mentally
ill inmate in custody at Bellevue Hospital Prison Ward, Patrick Miller, was beaten to death by
DOC staff.  Several DOC employees witnessed the assault—which caused such massive trauma
to Mr. Miller's head, neck, and heart that he died within an hour of the brutal attack—but failed
to intervene.  *Miller v. City of New York*, Civ. No. 1:08-cv-04577-KBF at Dkt. 1 (S.D.N.Y. May
15, 2008).

52.     On August 18, 2012, as alleged in a federal criminal complaint, an inmate in
custody at Rikers Island, Jason Echevarria, died after screaming for medical assistance for hours.
Correction officers at Rikers informed the officer in charge of the inmate's severe medical
distress, only to be told not to raise the issue again unless "there was a dead body."  *U.S. v.
Pendergrass*, 14-mag-583 at Dkt. 1 (S.D.N.Y. Mar. 21, 2014).

53.     In September of 2013, as reported by numerous media sources and as alleged in a

federal civil complaint, Bradley Ballard, a mentally ill inmate at Rikers Island died after he was locked up continuously for seven days in a cell that lacked running water.  According to the complaint, Mr. Ballard was deprived of needed treatment and medication and left to die in his cell after he developed sepsis.  *Griffin v. City of New York*, No. 14-cv-7329 at Dkt. 1 (S.D.N.Y. Sept. 10, 2014).

54.     Similarly, on April 3, 2014, as reported by numerous media sources, a mentally ill former United States Marine in custody at Rikers Island named Jerome Murdough died as a result of overheating in his cell.  Mr. Murdough's cell was supposed to be monitored by a correction officer, but no such monitoring took place; instead Mr. Murdough was left to bake to death.

55.     The DOC acknowledged that this last incident was not isolated, admitting that it demonstrated "systemic management problems."  "Warden at Rikers Island Demoted After Inmate Dies in Overheated Cell," THE NEW YORK TIMES, Apr. 4, 2014, at A20.

56.     New York City Mayor Bill De Blasio has also acknowledged that, with respect to proper care for mentally ill inmates, New York City's jails have "sadly lagged behind other corrections systems."  "U.S. Accuses Rikers Officer of Ignoring Dying Plea," THE NEW YORK TIMES, Mar. 25, 2014, at A1.

57.     Norman Seabrook, the head of the Correction Officers' Benevolent Association, a union representing many DOC officers, has stated publicly that DOC officers receive insufficient training with respect to the supervision of mentally ill inmates.  "Warden at Rikers Island Demoted After Inmate Dies in Overheated Cell," *supra* at ¶ 47.

58.     A recent New York Times exposé chronicles the extent of the DOC's failure to address the abuse of mentally ill people in its custody.  The report identifies 129 cases of

violence against inmates at Riker's Island over an eleven-month period, concluding that "it is inmates with mental illnesses who absorb the overwhelming brunt of the violence."  The article notes that DOC's failure to protect the mentally ill persists in part because of "the reluctance of the city's Department of Correction to acknowledge the problem and the fact that guards are rarely punished."  Of particular relevance to this case, out of the 129 cases explored by the Times, "[m]ore than half of the inmates reported facing 'interference or intimidation' while seeking treatment after an altercation."  "Rikers: Where Mental Illness Meets Brutality in Jail," THE NEW YORK TIMES, July 14, 2014, at A1.

59.     In the cases of Mr. Miller, Mr. Echevarria, Mr. Ballard and Mr. Murdough, on information and belief, the deaths of mentally ill inmates was a direct result of DOC officers' failing to stop abuses in progress, refusing to save the lives of inmates in obvious need of immediate medical care, and failing to monitor obvious dangers to inmate safety.

60.     In the case of Mr. Carter, the Individual Defendants were nearby or present while defendant Rodrigues beat Mr. Carter, but failed to intervene to protect the health and safety of Mr. Carter, who was obviously and desperately in need of help.  After the beating, the Individual Defendants proceeded to interfere with Mr. Carter's ability to receive appropriate treatment, as happened in more than half of the 129 cases of inmate abuse studied by the New York Times (*see* ¶ 51, supra).

61.     Mr. Carter filed a written notice of claim with the City Comptroller's Office at 1 Centre Street, New York, New York on or about March 18, 2014.

62.     Mr. Carter filed a written notice of claim with HHC's Office of Legal Affairs Claims Division at 125 Worth Street, #257, New York, New York on or about March 18, 2014.

63.     More than 30 days have elapsed since the filing of the notices of claim, and the

City and HHC have not settled the action.

64.     This action has been commenced within one year and ninety days after the

happening of the events upon which the claims are based.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 / Eighth and Fourteenth Amendments
### (Against All Individual Defendants)

65.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully

set forth at length herein.

66.     By reason of the foregoing, and by assaulting, beating, and using gratuitous,

excessive, sadistic, and unconscionable force against Mr. Carter, resulting in severe injury and

by demonstrating deliberate indifference towards such actions and failing to prevent defendant

Rodrigues from using such force, Rodrigues, Officer Bisono, Officer Archer, Sanchez and Boyce

Carter deprived Mr. Carter of rights, remedies, privileges, and immunities guaranteed to every

citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights

guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution to be

free from gratuitous and excessive force, and from cruel and unusual punishment.  These

defendants' conduct manifested deliberate indifference to Mr. Carter's constitutional rights.

67.     Upon information and belief, defendants conspired among themselves to deprive

Mr. Carter of his constitutional rights secured by 42 U.S.C. § 1983, and by the Eighth and

Fourteenth Amendments of the United States Constitution, and took numerous overt steps in

furtherance of such conspiracy.

68.     Defendants acted under pretense and color of state law and in their individual and

official capacities and within the scope of their respective employments as DOC and HHC

employees.  Said acts by defendants were beyond the scope of their jurisdiction, without

authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly,

and with the specific intent to deprive Mr. Carter of his constitutional rights secured by

42 U.S.C. § 1983, and by the Eighth and Fourteenth Amendments of the United States

Constitution.

69.     As a direct and proximate result of the misconduct and abuse of authority detailed

above, Mr. Carter sustained the damages alleged above.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 / Eighth and Fourteenth Amendments
### (Against Defendants Rodrigues, Archer, Sanchez and Boyce Carter)

70.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully

set forth at length herein.

71.     As a result of having been the victim of a violent and unprovoked assault and

having been previously diagnosed with mental illness, Mr. Carter had a serious medical need of

immediate psychiatric treatment to address his emotional and psychological trauma.

72.     By reason of the foregoing, Defendants Rodrigues, Archer, Sanchez and Boyce

Carter  caused Mr. Carter to be deprived of appropriate and necessary treatment for the

emotional and psychological trauma Mr. Carter suffered as a result of the attack, through actions

including, without limitation, falsely communicating that Mr. Carter engaged in an assault of

defendant Rodrigues and deceiving Mr. Carter's treating staff into believing that Mr. Carter was

the aggressor in the attack.

73.     By their actions, these Defendants deprived Mr. Carter of rights, remedies,

privileges, and immunities guaranteed to every citizen of the United States, in violation of 42

U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth

Amendments of the United States Constitution to receive adequate medical care and not have

serious medical needs ignored.  Their conduct manifested deliberate indifference to Mr. Carter's

constitutional rights.

74.     Defendants witnessed the assault on Mr. Carter and its aftermath and therefore knew that a serious medical need existed for such care, but obstructed the provision of that care and subjected Mr. Carter to improper and inadequate psychiatric treatment by falsely representing that Mr. Carter initiated the assault, and was not its victim.

75.     Upon information and belief, defendants conspired among themselves to deprive Mr. Carter of his constitutional rights secured by 42 U.S.C. § 1983, and by the Eighth and Fourteenth Amendments of the United States Constitution, and took numerous overt steps in furtherance of such conspiracy.

76.     Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as DOC and HHC employees.  Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Carter of his constitutional rights secured by 42 U.S.C. § 1983, and by the Eighth and Fourteenth Amendments of the United States Constitution.

77.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Carter sustained the damages alleged above.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1983 / Eighth and Fourteenth Amendments**
**(Against Defendants HHC and City)**

78.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

79.     As joint operators of the Bellevue Hospital Prison Ward, defendants HHC and City (through DOC) share responsibility for the customs, policies, patterns and practices in place regarding the operation of that facility.

80.     On information and belief, at all relevant times, Defendants HHC and City, acting

under pretense and color of law, adopted, permitted, tolerated or were deliberately indifferent to customs, policies, patterns or practices that include:

    a.   a custom, policy, pattern and practice whereby HHC and DOC do not properly supervise their employees, including without limitation by engaging in a policy or practice whereby HHC staff members who have previously engaged in physical altercations with an inmate are allowed to exercise one-on-one supervision over said inmate;

    b.   a custom, policy, pattern  and practice whereby HHC and DOC employees tolerate abuse of mentally ill inmates and refuse to intervene on behalf of said inmates when they are being abused by fellow staff members;

    c.   a custom, policy, pattern and practice whereby HHC and DOC enable their employees to make false statements against inmates with the intent of concealing incidents of inmate abuse; and

    d.   a custom, policy, pattern and practice whereby HHC and DOC do not properly train employees in the appropriate use of force and restraint of mentally ill patients, or discipline them for using excessive force.

81.    Each of the behaviors above constitutes a municipal policy, practice, or custom and led to Mr. Carter's assault.

82.    By permitting, tolerating and sanctioning persistent and widespread policies, practices and customs pursuant to which Mr. Carter was injured by a dangerous chokehold, placed under the supervision of an individual who strangled him the day before, and then subjected to a beating that no HHC or DOC staff acted to stop once in progress, defendants HHC and City deprived Mr. Carter of rights, remedies, privileges, and immunities guaranteed to every

citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Eighth and Fourteenth Amendments to be free from gratuitous and excessive force and cruel and unusual punishment.

83.     As a direct and proximate result of the policies, practices and customs detailed above, Mr. Carter sustained the damages alleged above.

**FOURTH CLAIM FOR RELIEF**
**Assault and Battery**
**(Against Rodrigues and Defendant HHC)**

84.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

85.     In physically assaulting Mr. Carter, defendant Rodrigues acted in his capacity as an HHC employee and within the scope of his employment, and committed a willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Carter.

86.     The assault and battery by Rodrigues was unnecessary and unwarranted in the performance of his duties as an HHC employee and constituted and unreasonable and excessive use of force.

87.     Defendant HHC, by its officers, agents, servants, and employees, was responsible for Mr. Carter's assault and battery.  Defendant HHC, as employer of Rodrigues, is responsible for his wrongdoing under the doctrine of *respondeat superior*.

88.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Carter sustained the damages alleged above.

## FIFTH CLAIM FOR RELIEF
### New York State Constitution, Art. I, § 5 and Art. I, §12
### (Against All Defendants)

89.      Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

90.      By reason of the foregoing, and by using excessive force against Mr. Carter and failing to prevent the use of excessive force against Mr. Carter, defendants deprived him of rights, remedies, privileges and immunities, including the right to be free from cruel and unusual punishment, guaranteed to every New Yorker by Article I, § 5 and 12 of the New York Constitution.

91.      Upon information and belief, defendants conspired among themselves to deprive Mr. Carter of his constitutional rights secured by Article I, § 5 and  § 12 of the New York Constitution and took numerous overt steps in furtherance of such conspiracy.

92.      Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as DOC and HHC employees.  Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Carter of his constitutional rights secured by Article I, § 5 and  § 12 of the New York Constitution.

93.      Defendant City, by its officers, agents, servants and employees, was responsible for the deprivation of Mr. Carter's state constitutional rights.  Defendant City, as employer of Officer Archer and Officer Bisono, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

94.      Defendants HHC, by its officers, agents, servants and employees, was responsible for the deprivation of Mr. Carter's state constitutional rights.  Defendant HHC, as employer of

the Rodrigues, Sanchez and Boyce Carter, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

95.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Carter sustained the damages alleged above.

**SIXTH CLAIM FOR RELIEF**
**Negligence**
**(Against All Defendants)**

96.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

97.     Defendant Rodrigues owed a duty of care to Mr. Carter to refrain from conducting himself as to create an unreasonable risk of harm to Mr. Carter.   Defendants HHC, City, and the remaining Individual Defendants owed a duty of care to Mr. Carter, as a person under their custody and control, to control the conduct of third persons like Rodrigues in order to prevent them from intentionally harming Mr. Carter, and to report said conduct to prevent them additional violent acts.

98.     Defendants breached that duty of care, including, without limitation, by assaulting, beating and using gratuitous, excessive, sadistic and unconscionable force against Mr. Carter, resulting in severe injury, and failing to prevent or restrain Rodrigues from doing the same.

99.     Defendants further breached that duty of care, including, without limitation, by causing Mr. Carter to be deprived of necessary treatment for emotional and psychological trauma and exacerbating that trauma by engaging in actions including, without limitation, falsely and knowingly communicating that Mr. Carter engaged in an assault of defendant Rodrigues.

100.     As a direct and proximate result of this unlawful conduct, Mr. Carter sustained the damages alleged above.

101.   All of the foregoing occurred without any fault or provocation on the part of the Mr. Carter.

102.   Defendants City and HHC, by their officers, agents, servants, and employees, were jointly responsible for Mr. Carter's custody and care during the relevant time period.

103.   Defendant City, as employer of Officer Archer and Officer Bisono, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

104.   Defendant HHC, as employer of Rodriguez, Sanchez and Boyce Carter, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

### SEVENTH CLAIM FOR RELIEF
**Negligent Hiring, Training, Supervision, Discipline and Retention of Services
(Against Defendants HHC and City)**

105.   Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

106.   As joint operators of the Bellevue Hospital Prison Ward, defendants HHC and City (through DOC) share responsibility for hiring, training, supervising, disciplining and retaining the employment services of individuals employed at that facility.

107.   Defendants HHC and City owed a duty to Mr. Carter to exercise due care, including, without limitation, by selecting and retaining competent personnel to treat, supervise and protect Mr. Carter and training, supervising, and disciplining those employees.

108.   Upon information and belief, defendants HHC and City breached that duty of care, including but not limited to in the following ways:

a)   by failing to properly screen defendant Rodrigues and then negligently hiring and retaining him in a position that presented a foreseeable risk of harm to Mr. Carter, where Rodrigues was unfit and incompetent for his position, and had a known or reasonably knowable history and propensity

for dangerous and violent conduct—the exact behavior that subsequently

caused Mr. Carter's injuries;

b)  by failing to train, supervise and discipline Rodrigues in his duties as a

PSH Technician, including without limitation by failing to train and

supervise Rodrigues in the appropriate use of force and restraint of

mentally ill patients, and to discipline him for using excessive force,

where Rodrigues had a known or reasonably knowable history and

propensity for dangerous and violent conduct; and

c)  by failing to train, supervise and discipline the Individual Defendants in

their duty to intervene on behalf of a mentally ill inmate when that inmate

was being abused by staff and to facilitate the provision of appropriate

psychiatric care to victims of abuse by providing true and accurate

information regarding this abuse, where the Individual Defendants had a

known or reasonably knowable history of displaying deliberate

indifference towards incidents of staff-on-inmate violence.

109.    Upon information and belief, Mr. Carter's injuries would not have occurred but

for defendants' HHC and City failure to take reasonable care in making decisions regarding (a)

defendant Rodrigues's hiring, training, supervision, discipline and retention; and (b) the

Individual Defendants' training, supervision and discipline.

110.    Upon information and belief, defendants HHC's and City's negligence in hiring,

training, disciplining, supervising and retaining defendant Rodrigues, and their negligence in

training, supervising and disciplining the Individual Defendants proximately caused Mr. Carter's

injuries.

WHEREFORE, plaintiff respectfully requests judgment against defendants as follows:

(A)     an order awarding compensatory damages in an amount to be determined at trial;

(B)     an order awarding punitive damages in an amount to be determined at trial;

(C)     reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(D)     directing such other and further relief as the Court may deem just and proper,

together with attorneys' fees, interest, costs and disbursements of this action.


Dated: New York, New York.                     Respectfully submitted,
       September 16, 2014


                                   By:    /s/  Kimo S. Peluso
                                        Kimo S. Peluso
                                        Nirav S. Shah
                                        MANATT, PHELPS & PHILLIPS, LLP
                                        7 Times Square
                                        New York, NY  10036
                                        (212) 790-4500
                                        *Attorneys for Plaintiff Elimeen Carter*